IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**JAMES ALLEN HARRIS,**
        **Petitioner,**

-vs-
                                        **Case No.  A-14-CA-841-SS**

**WILLIAM STEPHENS,**
        **Respondent.**

---

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Petitioner James Allen Harris's Petition for Writ of Habeas Corpus [#1], the Report and Recommendation of the United States Magistrate Judge [#9], and Harris's Objections [##10, 11].[1] Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

All matters in this case were referred to United States Magistrate Judge Andrew W. Austin for report and recommendation pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.  Harris is entitled to de novo review of the portions of the Magistrate Judge's report to which he filed specific objections.  28 U.S.C. § 636(b)(1).  All other review is for plain error.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).  Nevertheless, this Court has reviewed the entire file de novo, and agrees with the Magistrate Judge's recommendation.

---

[1] Harris filed his own pro se Objections [#10] in addition to his retained counsel's Objections [#11].



**Background**

## I.     Harris's Criminal History

According to Respondent, the Director has lawful and valid custody of Petitioner James Allen Harris pursuant to a judgment and sentence of the 277th District Court of Williamson County, Texas, in case number 09-147-K277.   A jury found Harris guilty of two counts of aggravated assault, and the court sentenced him to two concurrent sentences of 75 years in prison.

The Third Court of Appeals affirmed Harris's conviction. *Harris v. State*, No. 03-10-00174-CR, 2012 WL 1149337 (Tex. App.—Austin 2012, pet. ref'd).   The Court of Criminal Appeals refused his petition for discretionary review. *Harris v. State*, PDR No. 0517-12 (Tex. Crim. App. Oct. 3, 2012).

Harris then filed a state application for habeas corpus relief.   The trial court requested proposed findings of fact from both parties but then forwarded the case to the Texas Court of Criminal Appeals without adopting either party's submissions.   On August 20, 2014, the Court of Criminal Appeals denied the application without written order. *Ex parte Harris*, Appl. No. WR-81,613-01 at cover.

## II.    Factual Background

On February 2, 2008, Harris crashed his truck into two other vehicles, injuring two people. *See Harris*, 2012 WL 1149337, at *1.   A number of eyewitnesses to the car wreck testified at trial, including Deputy Sheriff Christopher Cox who happened to have pulled over an unrelated car for a traffic violation and was in a position to observe Harris's behavior and crash. *See* State Court Record [#4-11] at 12–21 (trial testimony of Christopher Cox).   Cox testified that he saw a black

Chevrolet Tahoe/Suburban[2] traveling northbound in the center turn lane, and the Suburban had come to a stop, waiting for traffic to clear in order to execute a left turn. *Id.* at 13–14. Harris, driving a blue Dodge Ram, came up behind the Suburban in the center turn lane at a high rate of speed. *Id.* Seemingly in an attempt to avoid hitting the Suburban from behind, Harris swerved his truck to the left into oncoming traffic. *Id.* at 13–14. As he swerved, he clipped the left rear part of the Suburban with the front right part of his truck, and immediately afterward, he hit a red Chevrolet Silverado traveling southbound in a head-on collision. *Id.* at 14. After tending to the injured occupants of the Silverado, Cox found Harris walking on the highway, and according to Cox, Harris appeared "very lethargic, very—looked lost, confused. From my experience I immediately thought of either some sort of severe medical condition or an intoxication . . . ." *Id.* at 15. Harris was later taken to a hospital where he tested positive for Valium and Soma, both of which are central-nervous-system depressants. *Harris*, 2012 WL 1149337, at *1.

Harris's testimony was corroborated and expanded upon by a couple, Don and Virginia Ramsey, who were driving northbound on U.S. 183 at the time and observed the collision from behind Harris. *See* State Court Record [#4-11] at 25–31 (trial testimony of Don Ramsey), 31–37 (trial testimony of Virginia Ramsey). Both testified their attention was first drawn to Harris when they observed him driving his blue pickup erratically and pulling out from their left across two lanes of traffic and into the center turn lane heading north. *Id.* at 26, 32. Mrs. Ramsey, who was traveling in the lefthand lane of the two northbound lanes, slowed down to allow Harris space to merge into her lane from the center turn lane. *Id.* at 32. Harris, still in the center turn lane, first almost hit a car

---

[2] Cox referred to the vehicle as both a Tahoe and a Suburban at trial. For clarity, the Court will refer to the vehicle as a Suburban.

headed southbound that was also in the center turn lane, but he swerved to the left into oncoming traffic, avoided that car, and then swerved back into the center turn lane. *Id.* Mr. and Mrs. Ramsey observed Harris for enough time to discuss with each other Harris's erratic and reckless driving, their concern he had almost had three wrecks, and that the person driving the blue truck must be intoxicated because no reasonable driver would be driving in that manner. *Id.*

After Harris returned to the center turn lane, the Ramseys looked ahead and saw the black Suburban stopped in the center turn lane, facing north and waiting to turn left. *Id.* at 32–33. The Ramseys both had time to say "Oh my gosh. He's going to hit that. He's going to rear-end that Suburban." *Id.* at 33. At the last second, Harris swerved again into oncoming traffic, clipped the rear of the Suburban and collided head-on into the Silverado. *Id.*

The State charged Harris with two counts each of intoxicated assault and aggravated assault but eventually dropped the intoxicated assault charges. *Harris*, 2012 WL 1149337, at *1. The jury returned a guilty verdict on both counts of aggravated assault. *Id.* On direct appeal, Harris raised only one issue, arguing the trial court erred in refusing to instruct the jury that it could convict him of the lesser-included offense of deadly conduct. *Id.* The Court of Appeals rejected Harris's argument and affirmed his conviction. *Id.* at *2–3.

## III.  Harris's Grounds for Relief

Harris argues his trial counsel was ineffective for:

1.      failing to request a necessity instruction;

2.      failing to object to a statement in the State's closing argument; and

3.      failing to object to the State's comments during the penalty phase about Harris's tattoos.

**IV.    Exhaustion of State Court Remedies**

There is no dispute Harris has exhausted his state court remedies regarding the claims brought in his application.

**Analysis**

**I.    The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court has summarized the basic principles that have grown out of the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 783–85 (2011).  The Court noted the starting point for any federal court in reviewing a state conviction is 28 U.S.C. § 2254, which states in part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Court noted "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington*, 131 S. Ct. at 784.

One of the issues *Harrington* resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id.*  Following all of the Courts of Appeals' decisions on this question, the Court concluded the deference due a state court decision under § 2554(d) "does not require that there be an opinion from the state court

-5-

explaining the state court's reasoning." *Id.* (citations omitted).  The Court noted it had previously concluded "a state court need not cite nor even be aware of our cases under § 2254(d)." *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).  When there is no explanation with a state court decision, the habeas petitioner's burden is to show there was "no reasonable basis for the state court to deny relief." *Id.*  And even when a state court fails to state which of the elements in a multi-part claim it found insufficient, deference is still due to that decision because "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.*

As *Harrington* noted, § 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the Supreme Court; (2) when the earlier decision "involved an unreasonable application of" such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Id.* at 785 (citing 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir. 2000) (quotation omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.

*Id.* at 740–41 (quotation omitted).  Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant the writ "if the state court identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id.* at 741 (quotation omitted). The provisions of § 2254(d)(2), which allow the granting of federal habeas relief when the state court made an "unreasonable determination of the facts," are limited by the terms of the next section of the statute, § 2254(e). That section states a federal court must presume state court fact determinations to be correct, though a petitioner can rebut that presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). But absent such a showing, the federal court must give deference to the state court's fact findings. *Id.*

## II.    Ineffective Assistance of Counsel

Harris argues he was denied the effective assistance of counsel. Harris raised this issue in his state application for habeas corpus, and the Court of Criminal Appeals rejected the merits of Harris's claim. Therefore, the AEDPA limits the scope of this Court's review to determining whether the adjudication of Harris's claim by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.  In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind judicial scrutiny of counsel's performance must be highly deferential.  *Id.* at 686–89.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* (citation omitted).  Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged.  *Id.* at 695–97.  Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 687.

A.      **Failure to Request a Necessity Instruction**

Harris first asserts his counsel was ineffective for not requesting a necessity instruction under Texas Penal Code § 9.22.  Harris says the evidence at his trial supported a defense of necessity.  He insists that if his attorney had requested the instruction, the trial court would have granted the request and given the instruction, which alone would have changed the result of the trial.

Texas allows the use of a necessity defense if the following conditions are met:

(1)      the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2)     the desirability and urgency of avoiding the harm clearly outweigh, according
         to ordinary standards of reasonableness, the harm sought to be prevented by
         the law proscribing the conduct; and

(3)     a legislative purpose to exclude the justification claimed for the conduct does
         not otherwise plainly appear.

TEX. PENAL CODE § 9.22.  In addition to those three requirements, the defendant must also admit

to taking the "necessary" act or omission and having the requisite mental state.  *Juarez v. State*, 308

S.W.3d 398, 404 (Tex. Crim. App. 2010).  The defendant must "reasonably believe that his conduct

is immediately necessary to avoid a greater harm."  *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim.

App. 2010).

        Harris argues he had a necessity claim because he swerved out of the center turn lane into

oncoming traffic, out of necessity, to avoid hitting the first unidentified vehicle, and after returning

to the turn lane, again swerved into oncoming traffic, out of necessity, to avoid hitting the Suburban.

The evidence renders this argument baseless.  In claiming he swerved into oncoming traffic because

he reasonably believed that conduct was immediately necessary to avoid imminent harm, Harris

ignores his conduct that led him into that situation and the available alternatives he had that a

reasonable person would conclude to be safer.  Harris was intoxicated and driving recklessly

according to all eyewitness accounts.  Mrs. Ramsey testified Harris had multiple alternatives that

would have caused no harm.  For instance, she testified a person with "their mental faculties in

order" had time to apply the brakes and stop before hitting the Suburban.  *See* State Court Record

[#4-11] at 33.  In addition, she testified she slowed way down specifically to create space for Harris

to pull in front of her into the northbound lane and out of the center turn lane.  *Id.*  Instead, Harris

chose to swerve into the southbound lane just like he did seconds before to avoid the unidentified

vehicle.  *Id.*  Mrs. Ramsey testified Harris had "every opportunity to go around to the right of the

Suburban . . . without hitting anyone." *Id.* She testified a person with their mental faculties in order

would have done just that. *Id.* Mrs. Ramsey testified she could not understand why Harris was not

getting in the lane in front of her and that "in fact, it almost sounded like to me that he accelerated."

*Id.* Mrs. Ramsey encapsulated the "terror" of watching the easily preventable accident unfold in

front of her eyes:

> It makes you feel really sick inside because you know there's fixing to be an accident,
> and he's going to hit that black Suburban. There's no he way he could not hit that
> black Suburban unless at the very last possible minute he gets into traffic correctly.
> And for him to choose to go the opposite direction into oncoming traffic was
> just—we were just shocked that that accident could have been prevented if he had
> moved over into the right lane.

*Id.*

In his pro se objections, Harris rehashes the same arguments and even relies on Mrs.

Ramsey's testimony to suggest he made all of these split-second decisions over the course of a very

short period of time. *See* Objections [#10] at 1–2. While Mrs. Ramsey did state everything

happened very quickly and that she did not think Harris had time to judge the traffic around him, she

also made clear that he did not have time due to his own reckless driving. *See* State Court Record

[#4-11] at 33. Mrs. Ramsey's testimony could not make more clear that Harris had time to either

brake or move into northbound traffic—where there was space that she created—to avoid any

accidents. *Id.* Harris provides no rational basis for concluding his decision to swerve into oncoming

traffic on the highway was reasonably calculated to avoid harm when a reasonable, sober person had

multiple alternatives to avoid any harm whatsoever.

As such, Harris fails to show his counsel's performance was deficient for failing to request

a necessity instruction.

**B.      Failure to Object to Alleged Misstatement of Law in State's Closing Argument**

Harris next faults his counsel for not objecting to a statement by the prosecutor during his closing argument. Harris claims the prosecutor misstated the law when he argued to the jury: "Folks, if he has any ingested drugs in his system, he was being reckless. That's what the law says." *See* Mem. Law [#1-1] at 12 (citing State Court Record [#4-13] at 24). Harris contends that while "it is true that a jury, as the only finders of fact, *could* conclude that the ingestion of any drugs constitutes recklessness, it is certainly not true that the law provides that the ingestion of any drugs is *ipso facto* reckless." Mem. Law [#1-1] at 12. By failing to object to this statement, Harris argues, his counsel allowed the State to misstate the law, and as such, he was denied "a true jury determination as to whether the ingestion of drugs, under the circumstances *of this particular case*, was reckless." *Id.*

Harris was charged with two counts of aggravated assault. The indictment charged Harris had "recklessly caused bodily injury . . . by driving his vehicle into an oncoming lane of traffic, by striking a vehicle occupied by [one of the victims], by failing to keep a proper lookout, by operating a motor vehicle after ingesting a drug or dangerous drug, or a combination of these acts." *See* State Court Record [#4-3] at 40. Harris's counsel argued in his closing statement that Harris was not impaired when he was driving his truck and that the drugs in his system reflected only therapeutic usage. *See id.* [#4-13] at 23. The prosecutor, in responding to that contention, stated Harris was not tried for being intoxicated; he no longer was being charged with intoxication assault. *Id.* at 24. The relevant question highlighted by the prosecutor was whether Harris had ingested drugs because, pursuant to the indictment, ingestion of drugs was one of the ways by which Harris allegedly recklessly caused bodily injury. *Id.* When the prosecutor made the statement Harris argues was a misstatement of the law, the "law" the prosecutor was referring to was the indictment and the

charges contained therein.  While perhaps not articulated well, the prosecutor's attempt to state the law accurately for the jury as it was described in the indictment was not improper.  *See Taylor v. State*, 233 S.W.3d 356, 359 (Tex. Crim. App. 2007) (finding proper the prosecutor's restatement of the jury charge during closing argument because he "did not convey any information beyond what was properly contained in the charge").

Even if Harris is correct that the prosecutor misstated the law and that his attorney erred by not objecting, he fails to explain how the outcome of the trial would have changed if his lawyer had objected.  The record evidence supporting a finding of recklessness was ample.  Numerous eyewitnesses saw Harris driving in a manner they described as reckless without even knowing if he was intoxicated, although they speculated he must have been in order to drive so erratically.  In other words, the evidence showed Harris drove recklessly regardless of whether there was a finding he actually ingested any drugs.

With no showing of deficient performance or prejudice, Harris's ineffective assistance of counsel claim for failure to object to the prosecutor's alleged misstatement of the law in closing argument is denied.

## C.   Failure to Object to the State's Comments About Harris's Tattoos

In his final ground for relief, Harris asserts his counsel failed to object to a line of questioning by the prosecutor during the penalty phase of the trial.  Harris's counsel had put Harris's father, Dean Harris, on the stand as a witness to testify, among other things, about his son's good character.  *See* State Court Record [#4-13] at 41–42.  On cross-examination and in front of the jury, the prosecutor asked Dean Harris if he was aware his son had tattoos on his body depicting swastikas or the words "Aryan pride," and he responded that, while he was aware his son had tattoos, he did not know what

they depicted. *Id.* at 43. The prosecutor then approached the witness stand telling Dean Harris, "I'm going to show you what I've marked for identification purposes as State's Exhibits 62, 63, and 64, [and] ask if you recognize the tattoos in those photographs." *Id.* Harris has submitted affidavits from his father and his mother, which both swear that the jury was able to see the pictures of the tattoos as the prosecutor was showing them to Harris's father. *See* Mem. Law [#1-1] Exs. C (Dean Harris Aff.), D (Connie Harris Aff.).

After looking at the photos, Dean Harris again said he was aware of the tattoos but not familiar with their content. *See* State Court Record [#4-13] at 43. The prosecutor then approached the bench, and during a bench conference, asked the judge for permission to have James Harris show his tattoos to the jury. *Id.* At this time, Harris's counsel objected, arguing the tattoos were not relevant and were inflammatory. *Id.* The court did not rule on the objection, instead instructing the parties to finish with the testimony of the witness and telling them "we'll talk about it later." *Id.* The proceedings continued, and apparently, the issue was never raised again. Harris argues that his counsel should have objected sooner to the line of questioning and that by allowing the prosecutor to ask these questions in front of the jury and flash the photos in front of the jury, his attorney's performance was deficient. Furthermore, Harris contends the jury's knowledge of his "Aryan pride" and swastika tattoos led to prejudice in the form of his significant sentence of 75 years.

i.   ***Dawson v. Delaware***

In support of his argument, Harris cites *Dawson v. Delaware*, 503 U.S. 159 (1992). In *Dawson*, after the jury convicted Dawson of first-degree murder, the parties proceeded to a penalty hearing, and before the hearing, the prosecution gave notice it intended to introduce, among other evidence, (1) expert testimony on the history of the Aryan Brotherhood as well as the fact Dawson

had the words "Aryan Brotherhood" tattooed on his hand and (2) photographs of multiple swastika tattoos on his back. *Id.* at 161. After Dawson's counsel objected to the evidence as inflammatory and irrelevant, the parties agreed to the following stipulation regarding the Aryan Brotherhood evidence:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.

*Id.* at 162.

At the hearing, the prosecution read the stipulation to the jury and introduced evidence of the Aryan Brotherhood tattoo. *Id.* The court excluded all of the swastika evidence. *Id.* In addition, the prosecution submitted proof of Dawson's lengthy criminal record. *Id.* Dawson presented mitigating evidence based on the testimony of two family members and on the fact he had earned good time credits in prison for enrolling in various drug and alcohol programs. *Id.* The jury ultimately sentenced Dawson to death, and the Supreme Court of Delaware affirmed the convictions and the death sentence. *Id.* at 163.

The U.S. Supreme Court reversed, holding the admission of the Aryan Brotherhood evidence in this particular case was error as it violated Dawson's First Amendment right to join groups and associate with others holding similar beliefs. *Id.* at 163–64. The Court, however, made clear that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. Instead, the Court emphasized "'the sentencing authority has always been free to consider a wide range of material,'" and limited its holding to the circumstances

-14-

of the particular case before it, agreeing with Dawson that "in this case, the receipt into evidence of the stipulation regarding his membership in the Aryan Brotherhood was constitutional error." *Id.* at 164, 165 (quoting *Payne v. Tennessee*, 501 U.S. 808, 820–21 (1972)).

In particular, the Court focused on the stipulation and its limited reach as evidence. *Id.* at 165. Rather than presenting evidence on how the Aryan Brotherhood was a white racist prison gang associated with drugs, violence, and murder, which would have presented "a much different case," the prosecution "limited its proof regarding the Aryan Brotherhood to the stipulation." *Id.* The stipulation only proved the Aryan Brotherhood was a prison gang that originated in the 1960s, that entertained white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood. *Id.* In the Court's view, "the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding." *Id.*

Specifically, the prosecution failed to tie the evidence to the murder of Dawson's victim, nor was it relevant to help prove any aggravating circumstances because there was no proof the Aryan Brotherhood had committed any unlawful or violent acts. *Id.* at 166. Instead, "the inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Id.* In addition, the Court found the evidence was not relevant to rebut any mitigating evidence offered by Dawson, including the evidence of good character offered by family members. *Id.* at 167. While the Court recognized "the principle of broad rebuttal" allowed to prosecutors in presenting bad character evidence in response to good character evidence, it also found "the Aryan Brotherhood evidence in this case cannot be viewed as relevant 'bad' character evidence in its own right" because of its narrowness as described above. *Id.*

###### ii.     **Deficient Performance**

Applying *Dawson* to the circumstances of Harris's case, the Court observes a couple of differences which suggest the events of Harris's sentencing proceeding did not contravene the principles outlined in *Dawson*. First, the question and holding in *Dawson*, as explicitly framed by the Supreme Court, were limited to capital sentencing proceedings. *See id.* at 160 ("The question presented in this case is whether the First and Fourteenth Amendments prohibit the introduction *in a capital sentencing proceeding* of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding. We hold that they do.") (emphasis added). Harris was not facing a capital sentence; rather, he faced a sentencing range of 5 to 99 years for his aggravated assault convictions. *See* State Court Record [#4-13] at 47.

Second, the evidence of Harris's tattoos was never actually admitted, unlike the stipulation and the "Aryan Brotherhood" tattoo in *Dawson*. Relatedly, the line of questioning by which the prosecutor was attempting to lay a foundation for the admission of the tattoo evidence was not necessarily improper. In *Dawson*, the Supreme Court took issue with the fact the prosecution failed to present any evidence, for example, that the Aryan Brotherhood committed unlawful or violent acts and instead relied solely on the brief stipulation that was generic, broad, and unrelated to the specific circumstances of Dawson's case. Therefore, the prosecutor in Harris's case could have presented more specific, relevant evidence on the significance of "Aryan pride" or swastikas, which potentially would have made the evidence of his tattoos permissible under *Dawson*; specifically that sort of evidence could potentially have made the tattoos admissible as bad character evidence to rebut Harris's father's testimony that Harris was a good person. However, because Harris's counsel

objected and because the prosecution never raised the issue again after the court indicated "we'll talk about it later," there never was any development of the record.

Nonetheless, the record, as it stands, contains only questions from the prosecutor made in front of the jury, and with no resolution of those questions, the jury is simply left with nothing but suggestions of Harris's associations with a group and whatever abstract beliefs that association entails. While Harris's counsel did ultimately object, Harris effectively points out "[t]he horse had already left the barn by the time trial counsel got around to lodging an objection." *See* Mem. Law [#1-1] at 15 n.8. There is no good reason why counsel did not object as soon as the prosecutor asked Harris's father "Are you aware of any tattoos or body markings [your son] might have?" and "to describe to the jury what kind of tattoos he has."[3] *See* State Court Record [#4-13] at 43. Certainly, once the prosecutor asked "Are you aware that he has 'Aryan pride' tattooed on his body?", counsel should have immediately objected. Instead, he waited for the prosecutor to actually request Harris show his tattoos to the jury before he objected, allowing the prosecutor, in the meantime, to ask numerous questions that made clear Harris had tattoos of "Aryan pride" and swastikas.

Given counsel's failure to file a motion in limine and his failure to object as soon as the prosecutor raised the issue of Harris's tattoos, the Court finds strong support for concluding counsel's performance was deficient. The Court, however, is not considering the question in the first instance but instead through the frame of AEDPA. The Court's "task under the AEDPA is to determine whether the state habeas court's application of the law to the facts was reasonable," and "[i]mportantly, in order to to grant habeas relief from a state conviction following rejection of the

---

[3] In fact, while the parties do not discuss this issue, the Court fails to see why Harris's counsel did not handle this issue prior to the sentencing hearing by filing a motion in limine, which potentially would have resolved this issue at the outset and would have prevented the dispute from taking place in front of the jury.

petitioner's state habeas application, [the court] must conclude that the state habeas court's application of federal law was not only incorrect, but 'objectively unreasonable.'" *See Ward v. Dretke*, 420 F.3d 479, 499 (citations omitted).  As such, while the Court acknowledges counsel's performance may well have been deficient, the Court cannot say the state habeas court's decision to the contrary was an objectively unreasonable application of the law to the facts. *Id.* at 486 ("A state court's adjudication constitutes an 'unreasonable application' when the court identifies the correct governing legal principle from Supreme Court decisions, but applies that principle to the facts of a particular case in an objectively unreasonable way.") (citing *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (other citations omitted)).

### iii.    Prejudice

Alternatively, assuming the state court's decision was objectively unreasonable concerning the deficiency of counsel's performance, the Court considers whether Harris suffered prejudice as a result of his lawyer's conduct.  In order to prove prejudice, Harris "must establish a reasonable probability that but-for his counsel's deficient performance, he would have received a '*significantly* less harsh' sentence." *Ward*, 420 F.3d at 498 (quoting *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993)).  When applying this standard, the Court "must consider such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances." *Ward*, 420 F.3d at 498 (citation omitted).

Harris faced a sentencing range of 5 to 99 years, and he received a sentence of 75 years.  The evidence at trial established beyond a reasonable doubt that Harris, after ingesting drugs, drove his truck recklessly on the highway, swerving into and out of oncoming traffic while almost causing

multiple wrecks before ultimately driving his truck head-on into another truck.  The resulting crash caused severe injury to the passengers in the southbound truck driving on the proper side of the road. In addition, his parole requirements at the time of the offense required him to have a "Smart Start" device installed on his vehicle to prevent him from driving while intoxicated, and he did not have the device installed at the time of the offense.  *See* State Court Record [#4-13] at 33, 36.  At sentencing, the prosecution introduced evidence of sixteen prior convictions, including seven prior felonies. *See id.* at 31–32, 43; *id.* [#4-15] State's Ex. 61.  One of his convictions was for robbery, and the victim of the robbery testified Harris had stuck a box cutter with an exposed blade to her side while telling her "Don't make me hurt you."  State Court Record [#4-13] at 39.  Given this overwhelming evidence of the underlying offense and aggravating circumstances, Harris fails to show he was subjected to significant or additional prison time as a result of the tattoo inquiry and therefore fails to establish prejudice.

Furthermore, even if the Court concluded Harris was prejudiced, the Court is limited to AEDPA review.  Given this restricted frame, the Court cannot say the state habeas court's decision to deny Harris's petition constitutes an objectively unreasonable application of federal law to the facts of this case.  *See Ward*, 420 F.3d at 499; *see also id.* at 500 ("In short, looking as we must through the prism of AEDPA deference, we decline to disturb the state habeas court's determination that [the defendant] was not prejudiced.").

The Court denies Harris's claim of ineffective assistance of counsel based on his counsel's failure to object to questioning regarding his tattoos.

**Conclusion**

The Court agrees with the Magistrate Judge's Report and Recommendation, and Harris's Petition for Writ of Habeas Corpus [#1] must be DENIED.

An appeal may not be taken to the court of appeals from a final order in a proceeding under § 2254 "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Proceedings, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejects a movant's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal of Harris's § 2254 petition on substantive or procedural grounds, nor find the issues presented are adequate to deserve

-20-

encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484)).  Thus, a certificate of appealability shall not issue.

Accordingly,

IT IS ORDERED that Petitioner James Allen Harris's Objections [##10, 11] are OVERRULED;

IT IS FURTHER ORDERED that the Report and Recommendation of the United States Magistrate Judge [#9] is ACCEPTED AS MODIFIED;

IT IS FURTHER ORDERED that Petitioner James Allen Harris's Petition for Writ of Habeas Corpus [#1] is DENIED; and

IT IS FINALLY ORDERED that a certificate of appealability is DENIED.

SIGNED this the _17th_ day of August 2015.

SAM SPARKS
UNITED STATES DISTRICT JUDGE